Now, the next case on the docket. Citizens United for Responsible Energy Development NFP v. Illinois Commerce Comm'n 525-0022. Is it Long or Lang? Yes. Oh, Mr. Long, I didn't recognize you. I'm sorry, I couldn't hear your voice. That's okay. Are you ready? I am, I am, I am. Okay. Yes. I speak on behalf of Citizens United for Responsible Energy Development NFP, which I'll hereinafter refer to as Cured NFP. My co-counsel, Edward McNamara, was obliged to keep another commitment, which he previously made, and so he is not here with me today. I'm having a hard time hearing you. Oh, all right, I'll speak up. You can speak up, sorry. In preparing this argument, I discovered that in the middle line on page 43 of the initial brief, I had used the wrong letter prefix to indicate where certain testimony by witness Jenna Mauer was to be found in the record on appeal. I referred in that middle line to E668 and E669, which erroneously suggested that the testimony was to be found in the exhibits portion of the record on appeal. The testimony in question is found, however, in the report of proceedings part of the record on appeal, which means that the letter prefix should be R. So instead of E668, that should be R668, and instead of E669, it should be R669. This case is a licensing proceeding brought under Section 8-406 of the Public Utilities Act, which is required by law to be proceeded by notice and an opportunity for a hearing. Section 10-65A of the Illinois Administrative Procedure Act provides that the contested case provisions of the IAPA shall apply to this licensing proceeding. The first notice of hearing in this case was a notice of a pre-hearing conference issued and served by the Commission on April 20, 2023. Cured NFP became a party to this case on May 16, 2023, when the ALJ granted its petition to intervene. Section 10-60A of the IAPA provides that after a notice of hearing in a contested case or licensing, agency employees, quote, shall not communicate directly or indirectly in connection with any issue of fact with any other person or party or in connection with any other issue with any party or the representative of any party except upon notice and an opportunity for all parties to participate. All five ex-party discussions instigated by staff counsel with attorneys for ATXI and with attorneys for Cameron Services Company occurred after the notice of hearing was issued on April 20, 2023 and after cured NFP became a party to the case on May 16, 2023. Consequently, subsection A of IAPA section 10-60 would appear at first glance to have prohibited staff counsel from instigating or holding any of those ex-party discussions. The Commission asserts that the first 29 words of the third paragraph of section 10-103 of the Public Utilities Act create an exception from IAPA section 10-60, from IAPA section 10-60's prohibition of ex-party communication for its staff. And that is, quote, the provisions of section 10-60 shall not apply, however, to communications between Commission employees who are engaged in investigatory, prosecutorial, or advocacy functions and other parties to the proceeding. You don't believe that's an exception? It is an exception. The challenge here is to understand exactly what it means. And I'll speak to that a little bit and then more a little bit later, Your Honor. The question is, does it mean when it says it applies to Commission employees who are engaged in investigatory, prosecutorial, or advocacy functions? And nobody's made a claim here that what was involved in this case was investigatory or prosecutorial. So the question is whether when these things happen, the staff counsel were engaged in advocacy functions. What they've argued is that you don't have to look at whether they were actually engaged in advocacy functions at the time they scheduled these ex-party discussions. What they say is they argue that this exception confers a status. Actually, what they say in their brief is that it causes them to occupy an advocacy function, which is the same as saying that they have a permanent advocacy status, which means, according to them, that you don't have to investigate or you don't have to analyze what they were doing to see whether they were performing an advocacy function. And the difficulty in this case for them, as we see it, is that there is nothing that we can see of an advocacy function in their scheduling, instigating, and holding these five ex-party discussions with lawyers for ATXI and with lawyers for Ameren Services Company. And these were rather big meetings. We've laid out in our brief that the first meeting involved six attorneys, four from the staff, I think two from ATXI. I can't remember if it's ATXI or Ameren. The meeting after that was seven lawyers. The two meetings after that were nine lawyers, and they were conducted by web conference and by e-mails and by telephone. And in the third and fourth meetings that involved the nine lawyers, they exchanged e-mails because they said in the second memorandum that they filed, they had to file what they called a memorialization of ex-party communication from interested parties. They filed three such memorializations. The second one concerned the third meeting and the fourth meeting. And they said in that second memorialization that they had received written communications, but they weren't submitting them. They said in that second memorialization that they had sent e-mail communications, but they weren't submitting them. Now, the statute that they rely upon is the Section 550 of the State Officials and Employees Ethics Act. And Section 550, subsection B-5, says that an ex-party communication received by an agency, agency head, or other agency employee from an interested party shall promptly be memorialized and made part of the record. And I would suggest that the court, maybe perhaps not now, but we have that at page 169 of the appendix. And that's found at C-953. The question is, well, one of the questions is, what did they do by way of memorialization of those e-mails? All they said was we received them, but we're not submitting them. And as to the e-mails they sent, they said we sent them, but we're not submitting them. So to this day, we don't know how many e-mails were received, how many were sent, what the content of any e-mail was, who the senders were, who the recipients were. The staff believes that, I suppose, just by checking the box that says that they were received but not submitted, and the box that said they were sent but are not being submitted, they've memorialized them. I don't think they've memorialized anything. In fact, I think the staff obviously failed to satisfy the requirements of Section 550 of the State Officials and Employees Ethics Act because they did not memorialize anything other than to say we got them. And so far as I can determine, there's nothing in Illinois law that says that acknowledging that you got something or that you sent it is a memorialization in any sense of the word. So... Mr. Long, do you have standing to raise the issue under the Ethics Act? Well, I'm raising it because that's their argument. I'm responding to it. I was going to say that they would bring up that act, but... Well, they do, Your Honor. You talk about Section 1060 of the Illinois Administrative Procedure Act. That's true. My question to you is, how has your client been harmed? Because as a result of the advocacy, if you will, it seems that ATXI amended their petition to remove that extra line, and then that proceeded on a whole different course, which your client didn't object. Well, Your Honor, the way that we're obviously... The way that we've obviously been harmed is that we were entitled to know what the female said. But what is the harm to you when you had notice of this proceeding going forward, you knew it involved two lines at the time... That's correct. After these contacts, depending on whether it was advocacy or not, you knew they occurred because some notice was given to you, but ATXI amended their petition to take out that second project. Well, Your Honor... So I'm having a tough time finding the harm here. Well, again, I don't mean to be redundant or repeating myself unnecessarily, but the harm for us obviously, to me it seems obvious, that under the law they were obliged to disclose the emails that they received, the emails that they sent. They didn't do it. Under the law, we were entitled to know what they had done. You didn't get notice. You just didn't get enough notice. Well, we didn't get any memorialization. They filed three memoranda. The second memoranda, excuse me, the second memorialization was the one that concerned the third and fourth meetings. So they admitted that they got emails, that they sent emails, but so far as what they said, they made no memorialization whatsoever. So that's what I get. I shouldn't say obviously, Your Honor, because that's up to the court to decide, but we believe that that was harm to us there because we were entitled to know what they were doing. And the other thing is, it's very difficult for us to see how what they did can be characterized as advocacy. It may be advocacy for ATXI. It obviously wasn't advocacy for cured NFP. And if you look at page 41 of their brief, they talk about the fact that they were trying to help ATXI deal with, I think that's how they said it, it didn't use the word unfortunate, but it was a defective original petition. So the question is, is that part of the staff's role to schedule five, six-party meetings and to advise the utility that there's a problem with their petition and to take care of that problem so far as the staff sees it before even letting the interveners know what they're doing? We just don't see how that could be part of advocacy on their part. Well, how would you define advocacy? Well, I've talked about that a little bit in our petition. Advocacy is something generally that you do out in the open. Lawyers talking to the court, trying to persuade the court. Advocacy is not something that you do in secret. I mean, there are other adjectives that you apply to things that you do in secret. It's not advocacy. So for the court to, for anyone to suggest that it's advocacy if you can hold five secret meetings and arrange things to make sure that the petition will be better and the case will go forward, to the exclusion of the interveners, how is that advocacy? I would like to say one thing if I can get this in in the time I have left. Another problem for the commission here is that it obviously imported supposed facts into its final order that were not in the record. And that's at page 51 of their final order. And both the Public Utilities Act in Section 10-103 and the IAPA prohibit that. Both acts say specifically that the decision has to be based exclusively on the record. And since they violated that, we believe that, well, that's a contested case provision. That's Section 10-35C of the IAPA. They plainly violated that. And what the statute says in IAPA Section 10-50C, a violation of these contested case provisions means that the decision is void, that the commission has no further jurisdiction. Thank you. Very quickly, I have a question. I believe there is a disputed standard of review, according to my notes, since I've read this case. What is your position on the standard of review for this case? Well, the standard of review that business and professional people for the public interest versus the Illinois Commerce Commission in paragraph 45, actually it shows up in two places, paragraph 29 and paragraph 45. It plainly is de novo. The efforts that the staff and ATSI have made to say that it's not de novo involve trying to make this appear as though work, that the issue here is evaluating the evidence. The issue here is not evaluating the evidence that was presented at trial. It's deciding what this exception means in Section 10-103 and how that relates to the provisions of the Illinois Administrative Procedures Act. Thank you. Mr. Johns, is that right? What was that? Mr. Johns? Oh, yes. Okay. And you're splitting your time? That's correct, Your Honor. Okay. And who do you represent? Brian Dodds representing the Illinois Commerce Commission. We'll be splitting Appellee's time eight minutes for the Commission. Ms. Wilson for Amarin Transmission will take the remaining seven minutes. Okay. We are not your timekeepers, so you'll have to worry about it with the clerk. Very good. We'll do so. We'll stay on top of it. May I introduce the court, counsel? Good morning, Your Honor. My name is Brian Dodds. As I said, I'm representing the Illinois Commerce Commission in this matter. Counsel for Amarin and I will be splitting our time, as I said, eight minutes to seven, and Ms. Wilson will address the second issue, the capacity to finance finding and why the Commission's order was supported by substantial evidence. I'll be addressing the first issue, what the bulk of Mr. Wong's argument addressed, Kirt's challenge on the ex parte basis. And, of course, should Your Honors have any questions, we'll So right out of the chute, I'm going to ask you to address the standard of review question that I asked you. Very good, Your Honor. What I heard the colloquy between Your Honors and Mr. Wong was regarding the ex parte issue. We agree that's a de novo standard of review with respect to the motion to dismiss. It's important to remember that they raised this ex parte challenge through a motion to dismiss and a motion attempting to reopen the record and supplement. Motions to supplement the record are reviewed for abuse of discretion, as we outlined in our brief. We agree that it's a de novo review. However, this is a construction of Section 10-103 of the Public Utilities Act, and ordinarily an agency construing its own statute is entitled to some deference. But for purposes of the argument, we agree that generally this is a de novo issue on the dismissal question. I want to make three points very clear and address some of the representations made by counsel. First, staff counsel satisfied the State Official and Employee Ethics Act at Section 5-50B-5. They satisfied that act by noting the memorializations in three forms for the five conversations. Second, looking at the chronology of this case is important because the denial of both of those motions were untimely or were a problem because they were patently untimely. They occurred 16 months into the case, 16 months after the conversations in question, after the briefing, after the close of evidence, and when a draft order that was adverse to their client had already been circulated. This was essentially an 11th-hour Hail Mary throw. And third, even if the Court found there was a bias or an ex parte problem, Keird's theory that this would void the proceeding is wrong under the Supreme Court and the Second District's decisions in E&E hauling. There's a six-factor test that we get to. You'll notice in the opening brief, the reply brief, and in the argument you just heard, there's no real engagement with those factors. But I want to emphasize to the Court that there is a test for that. Turning to the first point, Justice Gates, I think you hit the nail on the head. This case is about where is the harm to Keird. Here we have staff counsel in an advocacy role, representing staff experts in a proceeding evaluating Ameren's CPCN petition, looked at effectively the second part of the relief the utility was asking for and noticed a problem, what they saw as a problem, whether the Highland line, the Jarvis-Hershey line, would transfer to the utility from the municipality. We don't regulate municipal authorities. So whether that would transfer was subject to a reasonable disagreement. Lawyers for staff looked at the petition, paragraphs 36 to 39, and picked up the phone and said, we have a real problem here. This was entirely appropriate, ethical, and an ordinary function of staff's role. And to give the Court an analog, this is the equivalent of in a tort suit, an intervening party calling up the plaintiff's counsel and saying, your count two is not on good footing and we're going to move to dismiss it. If you were going to amend it, we might not contest, but we're going to try to dismiss it based on the authorities we have. That's all that happened here. And that happens in every circuit court in all 102 counties in this state every week. So the staff satisfied the memorialization requirements of the State Official and Employee Ethics Act. And although the requirement to memorialize under the Ethics Act is different than the Administrative Procedure Act, the Administrative Procedure Act, which the Court maintains erroneously, applies. That requires not only memorializing the conversations, but putting into the record written responses. The State Ethics Act does not put that onus on commission employees. The State Ethics Act says any covered employee, and the Illinois Commerce Commission is a covered agency in the State Ethics Act, it says any employee, regardless of your function, regardless of what you're engaged in, when you have a conversation with an interested party, you need to memorialize it and put it in the record. That's what staff counsel did here. And there was an obligation for them to further supplement with email exchanges or other documentation. And I want to emphasize here, turning to the second point, that the denial was proper because this was patently untimely. The case in question, Ian E. Holling, our Supreme Court, stated at Pennside 38, that when there is a claim of ex parte bias or partiality, I think counsel uses the word partisanship repeatedly, when there is that type of a problem arising, the challenger has a duty to promptly raise it. Here, we had a case that was initiated in April of 23. The conversations occurred at the end of May in 2023 and into June of 2023. And again, here waited until the close of evidence and close of briefing to essentially try to reopen the record. It's been some time since I've read these briefs. Wasn't there some information that came to light later during the hearing, I thought? I thought that there was some, that he knew that there was a meeting, but he didn't have all the information. I mean, at what point did it become untimely? At what point did he void it? Was there a premature? So the Ian E. Holling, excuse me, the Ian E. Holling Supreme Court decision doesn't lay out a bright line for timeliness. The problem is, so to answer the first part of your question, no. No new information came about. In fact, we know in the transcript at page 25 that on June 21st, at that second status hearing, counsel was aware of the discussions and they asked both staff counsel and counsel for Ameren, what was the nature of this discussion? And counsel for Kearns said, okay, well, that explains it. We understand. And didn't the court ask Kearns' counsel whether he had received the information and the acknowledgment that he had? That's precisely correct. The ALJs, in this case the hearing officers, who are decision makers, I want to emphasize those are true decision makers under business and professional people for the public interest. The Supreme Court and BPI at Penn State 38 carves out the investigatory prosecutorial advocacy function of staff counsel as separate from the decision makers. PUA 10-130 carves them out from the reporting requirements in the Administrative Procedure Act. And the timing of that acknowledgment that they had the information to the timing of the actual hearing, I think you said it was 16 months? It was. So the conversations occurred in May 2023. They were aware by the day after that fifth conversation. It occurred on June 20th. June 21st they had a status hearing and Kearns raised this when Ameren sought for an oral motion to bifurcate the proceeding. They wanted to amend the proceeding. Kearns said, well, we have some problems with that bifurcation and also these ex parte conversations came up. They then waited 16 months to file these motions until the close of evidence, close of briefing, and a draft order had been circulated. So this reads to us as procedural gamesmanship rather than a true effort to get to the bottom of e-mails or communications. I see my time is up. With that, I'll reserve the balance of time for Ms. Wilson. We ask the Court to affirm. Thank you. Thank you. Ms. Wilson. May it please the Court. I am Carrera Wilson on behalf of Ameren Transmission Company of Illinois, ATXI. I'll be addressing whether the commission in finding that ATXI can properly finance the proposed construction pursuant to Section 8406B3 of the Public Utilities Act was supported by substantial record evidence. The answer is yes, and Kearns' contrary arguments do not warrant reversal. The commission's final order should be affirmed for three main reasons. First, ATXI provided substantial evidence of its financial ability, including its ability to access $285 million to fund the $63 million project. Second, the commission properly relied on ATXI's substantial and unrebutted evidence and staff's concurrence in concluding that ATXI had satisfied subsection B3. Third, Kearns' arguments amount to conjecture. They lack merit and therefore are insufficient to overturn the commission's final order. Kearns frames this as a question of law and urges de novo review, but whether the record shows the utility is capable of financing a project is a fact-based determination, and the commission's findings of fact are presumed true and correct. A review in court may only reverse if the findings are not supported by substantial evidence. Here, the record and the commission's findings easily clear that bar. Turning to my first point, ATXI left no doubt about its financial ability. Substantial evidence is evidence a reasoning mind would accept in light of the commission's expertise as sufficient to support the challenged finding. Here, ATXI witnessed Mr. John Tree, a senior project manager, testify that the $63 million project will be initially financed through cash on hand or through short-term borrowings under the commission-approved and regulated Ameren Utility Money Pool with an available funding of $285 million. He explained that the borrowings would be refinanced with a balanced mix of long-term debt and equity. It would be supported by ATXI's A2 investment-grade credit rating. They also had a steady retained earnings and the ability to receive capital from Ameren Corporation. He further provided that the project's costs would be recovered through ATXI's transmission revenue requirement under the FERC-regulated MISO tariff. Staff reviewed that testimony, ATXI's discovery responses, and expressly found no reason to doubt it. This was reflected in staff Ms. Maurer's testimony, which brings me to my second point. The commission properly relied on ATXI's record, properly relied on the record evidence in finding ATXI financially capable. Specifically, the commission's final order in analyzing this issue noted the cost of the project, ATXI's concrete financing options through cash on hand, access to affiliate financing, up to $285 million in the utility money pool, its ability to access capital, markets with a strong A2 credit rating, retained earnings and equity. The commission also noted ATXI's explanation that the project's facilities would be recovered through a federally approved and regulated MISO Schedule IX. Final order also noted staff's sworn testimony, explaining that staff found no issues to contest and regarding ATXI's financial ability. And also noted, CURE provided no testimony, discovery requests or responses, or other evidence undercutting or even addressing ATXI's financial ability. The commission then correctly concluded that ATXI had satisfied subsection B3 and entered an order which is supported by substantial evidence. Only after coming to this conclusion did the commission observe and reject CURE's arguments, and it is here that CURE takes issue with the final order, which brings me to my third point. CURE's arguments are conjecture, they are not evidence, and they cannot overturn the commission's final order. Every one of CURE's arguments misses the mark. Section 8406B3 requires proof that ATXI can finance the project. It does not require a solvency audit of the money pool or a tariff tutorial from MISO or even through specific balance sheets. And even if a different set of documents could have also supported the same finding that the commission came to or even a different finding, that is not the test. The test is whether substantial evidence supports the finding the commission made, and here it surely does. And outside the record argument, it also likewise fails, because CURE claims that the commission relied on facts outside of the record by citing staff's reply brief when staff was referring to the review procedures that it undertook in investigating if ATXI satisfied subsection B3. And this was a necessary summary of staff's response, because it was in defense of itself, it as in staff, against untimely and improperly made claims by CURE. But just as the commission summarized staff's arguments, it also summarized CURE's untimely contentions that were made in its initial brief. However, the final order did not base its findings on such arguments outside of the evidentiary record. CURE conveniently disregards that the final order was first grounded in the findings on the record evidence, and then it addressed CURE's untimely initial brief contentions. And CURE's due process argument is baseless. It had notice, as your honors have recognized. They conducted over 70 discovery requests, cross-examined witnesses, all ATXIs and staff's witnesses, over a course of three days. They followed multiple motions and briefed the issues. By contrast, ATXI and staff were the ones that were deprived of due process, and CURE first raised these financing objections for the first time in their initial brief after the evidentiary record had closed. Your honors, CURE has failed to show the commission's finding to be against the manifest weight of the evidence. And to the contrary, every piece of concrete evidence in the record points to ATXI's financial soundness, while CURE only offers unfounded concerns. The commission's final order is well supported by substantial record evidence, and we ask that this court affirm the commission's final order. Thank you. So, Ms. Wilson, to follow up on a question Justice Scholar has been asking, you believe that as to your part of this argument, the standard of review is manifest weight of the evidence. That is correct, your honor. CURE can only win if the commission's order is against the manifest weight of the evidence and an opposite conclusion is clearly evident. And that's not what the record shows here and does not support that. Okay. Justice O'Connor? No questions. Thank you very much. Thank you, your honors. Mr. Long, will you follow up? Yes, your honor. Thank you. In response to staffs and commissions and ATXI citing the Ian E. Holland case, that case doesn't even cite the Illinois Administrative Procedure Act. And in that case, the question was whether the fact finders were biased. We don't say that. We're not claiming that the administrative law judges are the commission who decided this is biased. So Ian E. Holland and what it says about bias is just not relevant to what we've said here. The question of partisanship came up because we were characterizing the way that we saw staffs having these five ex-party discussions with ATXI. On that subject, I want to correct something. I said that the relevant page in the staff's brief was page 41. It's page 29. It says something about the fact that there was a defect in the pleading and that it was quite all right in their view for them to consult with ATXI to help correct it. Well, it may have been quite all right if they had done it openly. Why didn't they do it in open meetings, invite us to the meeting? But to do it in secret and to let us know about the result after it's over is a different matter. Now, with respect to the timeliness, the point here is we're relying on the Illinois Administrative Procedure Act and the contested case provisions. That statute does not say anything about how soon you have to bring this up. In fact, in the business and professional people's case we cited in the Senate brief, Justice Caldwell, before the court, said, a judgment, order, or decree entered by a court which lacks jurisdiction of the parties or of the subject matter which lacks the inherent power to make or enter the particular order involved is void and may be attacked at any time or in any court, either directly or collaboratively. So the fact is, if a violation by staff of the IAPA were completely obvious, if it were inarguable, the court on its own could notice it on appeal and say that's wrong, that was a violation of the contested case provisions, that causes the order to become void. So there's just no way that our filing this motion when we did was too late. Another thing the court might look at is Section 1070 of the Illinois Administrative Procedures Act. That talks about waiver. It says that a waiver can be made only in writing. And nothing like that happened here. We didn't waive anything. We raised the question as to the propriety of what staff had done. And it was timely under the Illinois Administrative Procedures Act because it says nothing about losing your right to bring it up at any time. That's if the order is void. I'm sorry? If the order is void, you can raise it. That's correct. Well, I should also point out that that's our theory, that because they violated the act, the order is, in fact, void. And that deprives the court. There's three kinds of jurisdiction that Justice Caldwell talks about. The last one is scope of authority jurisdiction. If what they did voided the order, they had no scope of authority. They had no jurisdiction. So thank you, Your Honors. Questions, please? Okay. Thank you all for your arguments here today. This matter will be taken under advisement. Thank you. Appreciate it.